The State Employees Injury Compensation Trust Fund (hereinafter referred to as "the Trust Fund") appeals from the Montgomery County Circuit Court's modification of its determination of the vocational-disability rating of Shirley Shade (hereinafter referred to as "the worker"). We reverse and remand.
On February 6, 1996, the worker, then a laboratory technician for the Alabama Department of Forensic Sciences, suffered an on-the-job injury to her back that the Trust Fund determined was compensable. As a result of her injury, the worker was treated by Dr. Warner Pinchback, who performed two surgeries on the worker's back. On November 20, 1998, Dr. Pinchback referred the worker to Rehab Associates for a functional capacity evaluation (hereinafter referred to as an "FCE"). In a report dated November 30, 1998, Rehab Associates determined that the worker's FCE results indicated that she met the guidelines for sedentary type work, but that those results were "not felt to be reflective of maximal functional abilities based on . . . discrepancies . . . which included symptom exaggeration, inconsistent movement patterns and an overperception of pain and disability." On April 1, 1999, Dr. Pinchback determined that, as a result of a simulated work environment ability test (hereinafter referred to as a "SWEAT test") performed on the worker on March 16, 1999, the worker would be best suited for sedentary type work with a lifting restriction of five pounds. Dr. Pinchback further determined that the worker "ha[d] about a 51% permanent total body impairment as a result of her lower back injury."
On May 19, 1999, Dr. Roger Kemp[1] referred the worker to Dr. Karl Kirkland by for a psychological evaluation to assess the viability of future surgery on the worker's back. On June 1, 1999, Dr. Kirkland issued a report in which he stated, in pertinent part: *Page 1138 
 "This patient was assessed using the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), the Pain Patient Profile, and the West Haven-Yale Multidimensional Pain Inventory (WHYMPI). Test results reveal a valid profile. Results are characterized by a great deal of somatization, depression, hypochondriasis, anger, hostility, and some exaggeration of symptomotology. This patient has settled into a permanent, chronic pain status. It is likely that her pain has functional autonomy. The problem is that there are multiple personality and functional variables present in this patient that are likely to add significantly to her self-report of pain. This examiner defers the medical assessment to the physicians involved. It would appear that she has been rated as having significant physical reasons to have some symptomotology based on Dr. Pinchback's letters. However, psychological test results reveal that her overall situation is extremely complicated and exacerbated by psychological symptoms. If surgery, for example, was optional in this patient it is suggested that surgery be avoided because of the above variables. She is not likely to respond positively to further surgical intervention. . . .
 "Obviously these results do not rule out the presence of true organic causes for some of her pain. This report simply documents that there are additional variables that are likely to explain a great deal of amplified pain responses and difficulties in treating this individual because of interpersonal problems."
In a June 30, 1999, progress note, Dr. Kemp listed the following impressions: "1. Failed back syndrome[;] 2. History of lumbar radiculitis[;] 3. History of somatiform conversion personality disorder[;] 4. Hypochondriacal personality disorder[;] 5. Depression[; and] 6. Possible paranoid personality disorder."
On July 30, 1999, Dr. Roland Rivard, to whom the worker was a referred by Dr. Pinchback, performed an independent medical examination (hereinafter referred to as an "IME") on the worker. On that same day, in a letter addressed to Dr. Pinchback, Dr. Rivard stated, in pertinent part:
 "I will now address the impairment rating. According to the [American Medical Association] Guides to the Evaluation of Permanent Impairment, fourth edition, before a judgment regarding impairment is made, it must be shown that the problem has been present for a period of time, is stable, and is unlikely to change in future months in spite of treatment. The [worker] has reached that stage ([maximum medical improvement]) and therefore qualifies for impairment rating.
 "In order to establish an impairment rating for the spine, the Guide designates two approaches. One component, which applies especially to [the worker's] traumatic injuries, is called the `Injury Model.' The other component is the `Range of Motion Model.' The Range of Motion Model should be used only if the Injury Model is not applicable, or if more clinical data are needed to characterize the [worker's] impairment. In this case, more data are not needed and the Injury Model does apply. Therefore I will utilize the Injury Model.
"She has 2 spinal fusions at 2 levels.
 "Listed on Table 70, page 108 of the Guide are the descriptions of various conditions with the corresponding DRE [diagnosis-related estimate] categories. She corresponds to the description of previous spine operation without loss of motion segment integrity or radiculopathy, *Page 1139 
for which the Guide has determined that the Category II, III, or IV of the Injury Model.
 "Using the range of motion model as a differentiator I must conclude that her condition corresponds to DRE lumbosacral Category IV for which the percentage of partial permanent impairment is 20% of the whole person.
 "Therefore it is my estimation that she has an impairment of 20% of the whole person due to the condition of her lumbar spine.
 "During the physical examination she has shown a strong pattern of symptom magnification, 4 of the Waddell types being positive and the Fabere's test being positive bilaterally. This attitude may be due to psychological problems, psychosocial problems, or may be an attempt at symptom magnification conscious or not in order to obtain secondary gain. Each and every one of the ergometric tests were invalid.
 "Therefore due to the strong pattern of symptom magnification and due to the ergometric tests being invalid I am unable to be specific about her work limitations. However, I have observed one objective sign during the physical examination: muscle spasms in the left paravertebral area which seems to confirm the presence of pain in the lumbar area. Therefore I must conclude that she probably has significant limitations in her activities of daily living but I am just unable to be specific about them.
 "The results of the test/retest of the Beck Inventory questionnaire and Life Impact Assessment questionnaire raise the possibility of nomgenic disorder (maintenance or aggravation of signs and symptoms of an illness or injury in expectation of secondary gain through litigation)."
On December 28, 1999, Dr. Ronald Moon performed an IME on the worker at the request of the Trust Fund. Dr. Moon had medical records from Dr. Pinchback,[2] Dr. Rivard, and Dr. Kirkland available to review. On that same day, Dr. Moon issued an "analysis of findings" in which he stated, in pertinent part:
 "After comprehensive evaluation and review of available medical records, it is clear that [the worker] is at Maximum Medical Improvement status. In calculating an impairment rating, I must concur with Dr. Rivard that the Range of Motion Model used by Dr. Pinchback should not be used and, therefore, the calculation of 51% is grossly overestimating and misrepresenting [the worker's] impairment.[3] Dr. Pinchback's prior office notes invalidate his own calculations. The [American Medical Association's] Guides, 4th Edition, clearly state that the Range of Motion Model should not be used in cases where there is evidence of inconsistency and submaximal effort and that impairment should be based on objective rather than subjective parameters. As such, in [the worker's] case, using the Injury Model as outlined on Page 3/108 (previous spine injury without loss of segmental integrity or radiculopathy), her impairment would be between 5% — 20% as noted on Page 3/102.
 "After comparing to the Range of Motion Model, Table 75, Page 3/113, *Page 1140 
Section IV.E.1, the total body impairment rating as determined based on multiple level operations, with residual, medically documented pain and rigidity with or without muscle spasm (12%), adding 1 level (1%) and then 2% for the second operation and 0% for the invalid Range of Motion measurements is 15%. (This calculation is consistent with Dr. Pinchback until he added the Range of Motion calculation, which invalidated his entire calculation.)
 "Therefore, [the worker's] total body impairment rating based on objective measures as outlined by the AMA's Guides to the Evaluation of Permanent Impairment 4th Edition is between 15%-20%. To be generous and consistent, I will agree with Dr. Rivard and affirm the 20% total body permanent partial impairment rating.
 "As far as functional status and return to work status, it is my professional opinion as a physical medicine and rehabilitation specialist and Fellow of the American Academy of Disability Evaluating Physicians that [the worker] is most certainly capable of performing her duties as a laboratory technician."
(Emphasis original.)
On May 12, 2000, Dr. J.C. Upshaw Downs, director of and state medical examiner for the Alabama Department of Forensic Sciences, wrote a letter to the worker informing her of his opinion that she could not perform the essential functions of her position as a lab technician "with or without reasonable accommodation."[4] On May 19, 2000, Dr. Downs wrote a letter to the worker informing her that he was terminating her employment with the Alabama Department of Forensic Sciences.[5]
On July 27, 2000, Renee Smith, a vocational case manager with Corvel Corporation, which, from the record, appears to be the Trust Fund's insurance carrier, issued findings from a vocational evaluation of the worker. In performing her evaluation, Smith reviewed: (1) her initial interview with the worker; (2) correspondence from the Department of Forensic Sciences; (3) Dr. Pinchback's medical records; and (4) the worker's report of the injury. In her evaluation, Smith summarized her findings as follows:
 "At the time of her injury, [the worker] had worked in jobs that could be considered light to medium depending on the specific task involved. Following this injury, she was restricted to sedentary employment. Fortunately, [the worker] has a college degree and some experience with general office equipment and with a computer. This background could be helpful in locating employment within the sedentary work capacity.
 "Taking into account all of the available information, it is determined that [the worker] has sustained a vocational loss of 63% as a result of her work related injury." *Page 1141 
On August 28, 2000, the Trust Fund sent a letter to the worker stating that, based upon (1) her reaching maximum medical improvement, and (2) Smith's 63% vocational-disability rating, the worker was entitled to permanent partial compensation in the amount of $33,440. The Trust Fund also offered the worker job-placement services. On September 11, 2000, the Trust Fund sent the worker a letter acknowledging that it had received a letter from her requesting a hearing before the Trust Fund's Review Board (hereinafter referred to as "the Review Board").[6] The Trust Fund's letter stated that the worker contested the determination of her vocational-disability rating and that she claimed to be "totally and permanently disabled from gainful employment."
On October 5, 2000, Rehab Associates performed a second FCE on the worker at the request of Dr. Kemp. On that same day, Rehab Associates sent a letter to Dr. Kemp stating, in pertinent part, that the "[e]valuation results are not felt to reflect maximal functional abilities based on the many discrepancies noted. True maximal ability can only be left to conjecture at this point." On October 25, 2000, Jane Logan, a vocational consultant, issued a "hypothetical vocational disability rating" based on a review of records, including: (1) information regarding Dr. Pinchback's treatment of the worker and his findings regarding her physical abilities; (2) the results of the first FCE performed by Rehab Associates; (3) the IME performed by Dr. Rivard and his findings; (4) the psychological evaluation performed by Dr. Kirkland and his findings; and (5) the IME performed by Dr. Moon and his findings. Considering Dr. Pinchback's findings, along with other factors such as the worker's age, education, location, wage loss, and loss of access to jobs in the market, Logan determined that the worker's vocational-disability rating was between 72% and 76%. Considering Dr. Moon's findings, together with the abovementioned factors, Logan determined that the worker's vocational-disability rating was between 61% and 65%.
On November 1, 2000, Renee Smith performed a second vocational evaluation on the worker. In addition to the materials she reviewed during her first evaluation, Smith also reviewed (1) the deposition of Dr. Moon; (2) Dr. Kirkland's medical records; (3) Dr. Kemp's medical records; and (4) Rehab Associates' medical records. Smith determined that the worker's vocational-disability rating was 52%. Smith stated that considering only Dr. Pinchback's opinion, the rating would be 63%; considering only Dr. Moon's opinion, it would be 43%. She explained that she arrived at her 52% rating by taking the opinions of both doctors into account.
On November 7, 2000, Nancy Crumpton performed a vocational evaluation of the worker at the request of the worker's counsel. In performing her evaluation, Crumpton reviewed (1) Dr. Pinchback's medical records; (2) Rehab Associates' medical records; (3) Dr. Kemp's medical records; and (4) Dr. Rivard's medical records. In her evaluation, Crumpton determined:
 "Taking into consideration [the restrictions assigned by Dr. Pinchback], [the worker's] continued medical treatment [by Dr. Kemp], and her pain level as well as the effects of medications she is taking[, the worker] would not be able to meet competitive work demands. As a *Page 1142 
result[,] she would be totally vocationally disabled."
On November 9, 2000, the Review Board conducted a hearing to consider the disputed vocational rating. During the hearing, the Review Board heard testimony from Renee Smith; Sandra Landers, a claims examiner for the Trust Fund; and the worker. The record of that hearing also contains all of the medical records previously discussed, as well as the transcribed deposition testimony of Dr. Moon. On November 28, 2000, the Review Board entered a decision that stated, in pertinent part:
"SUMMARY
 "A vocational expert, Renee Smith, conducted a vocational test and an interview with [the worker], reviewed the medical records of Drs. Pinchback, Moon, Kirkland and Kemp, and reviewed the [FCE]. Ms. Smith concluded [the worker] was either 52% or 63% vocationally disabled, depending on whether [the worker] was classified as a sedentary or light duty employee. [The Trust Fund] accepted the 63% determination and paid benefits accordingly.
 "[The worker] is a 46 year old woman with a college degree in biology and chemistry, along with skills and experience in using computers and office equipment. Ms. Smith testified that, based on her job market survey and a review of the newspaper's classifieds, there were job opportunities available to [the worker] within her physical restrictions.
 "An IME found `consistent documentation of inconsistencies and submaximal effort throughout formal testing (leading) to objective assessment of strong evidence of symptom magnification.' Formal psychological testing revealed `characteristics of significant somatization, depression, hypochondriasis, anger, hostility, and exaggeration of symptoms.'
"CONCLUSION
 "The burden of the Review Board is to determine whether there was a reasonable basis for the original decision made in this claim and, if so, whether there is now a compelling reason to change that decision.
 "Permanent and total disability, as defined in the [Trust Fund's] rules, includes a total incapacity from working at and being retrained for gainful employment. [The worker] has been found to have suffered an on-the-job injury and to have, as a result, a significant vocational disability. However, based upon the preponderance of the evidence, it appears to the Review Board that [the worker] is not totally and permanently vocationally disabled as that term is defined in the [Trust Fund's] rules. The [Trust Fund's] determination of a 63% vocational disability is upheld."
On December 22, 2000, the worker petitioned the trial court for a review of the Review Board's findings, pursuant to § 41-22-20, Ala. Code 1975. On August 27, 2001, the trial court set this case for a bench trial on December 19, 2001. On December 12, 2001, both the Trust Fund and the worker filed briefs with the trial court. On January 18, 2002, the trial court entered an order; that order stated:
 "This cause is before the court on a petition for review by the [worker]. [The worker] has asked the court to review the finding of the Review Board that she has sustained a 63% vocational impairment as a result of a job injury she sustained on February 6, 1996. [The worker] contends that she is 100% *Page 1143 
vocationally disabled. Liability is not an issue — only the extent of her disability.
 "This court only has the authority to reverse or modify a decision of an administrative agency if this court finds that the decision of the agency is `clearly erroneous' in review of the reliable, probative and substantial evidence on the whole record, or is `characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.' Section 41-22-20, Code of Alabama 1975.
 "The Trust Fund contends that the decision of the Review Board is supported by the testimony of Dr. Ronald Moon and by its vocational expert, Renee Smith. Dr. Moon was hired to perform an [IME], which he did on December 28, 1999. In [subsequently] arriving at the conclusion that [the worker] could return to her job as a laboratory technician, he rejected the opinion of Dr. Upshaw Downs, who is the Trust Fund Medical Examiner and Director of the forensic laboratory for which [the worker] worked, which was as follows: `I have reviewed the essential functions of the laboratory technician job and am of the opinion that you probably cannot perform these essential functions with or without reasonable accommodations.' Dr. Moon also rejected the results of the SWEAT test administered by Dr. Warner Pinchback, stating, in essence, that the SWEAT test was no longer the preferred method of testing one's physical capabilities in Birmingham. In so doing, he rejected the five (5) pound weight restriction assigned by Dr. Pinchback. It is worth noting that Dr. Moon rejected Dr. Pinchback's findings despite his admission that he didn't have most of Dr. Pinchback's records, and the fact that he had not conferred with Dr. Pinchback about [the worker].
 "Dr. Moon saw [the worker] on one occasion, which was ten (10) months prior to the hearing date.
 "The Trust Fund's vocational expert assigned [the worker] a 63% vocational impairment, and in doing so, she accepted Dr. Moon's findings, rather than Dr. Pinchback's findings. She testified that she was not aware that Dr. Downs had determined that [the worker] was not able to return to work as a laboratory technician.
 "Dr. Warner Pinchback has been [the worker's] primary treating physician, and he had been treating her for almost five years at the time of the hearing before the Review Board. Dr. Pinchback performed two surgeries on her, viz. a two-level lumbar arthrodesis and a fusion with threaded fusion cages. He administered a SWEAT test, which indicated that [the worker] should never bend, kneel, crouch, shoulder reach, overhead reach, or lift or carry anything greater than ten pounds, which Dr. Pinchback himself modified to five pounds. He assigned a 51% physical impairment rating.
 "The probative medical evidence indicates that [the worker] has been left with chronic back pain as a result of her job injury and surgeries incident thereto. At the time of the Review Board hearing, she was under the care of Dr. Roger Kemp, and under consideration was an implant of a percutaneous dorsal column stimulator in her back. According to Dr. Kemp, she has a failed back syndrome and bilateral lumbar radiculitis.
 "The reliable, probative and substantial evidence is that [the worker] is totally and permanently disabled from working. This opinion was also reached by the plaintiff's vocational expert, Dr. Nancy Crumpton, who opined that [the *Page 1144 
worker] would not be able to meet competitive work demands, and as a result would be totally vocationally disabled.
 "This court does not find that the Review Board's decision is supported by substantial evidence. Dr. Pinchback, as the treating physician, was in a far better position to determine [the worker's] physical capabilities, but his opinions and findings were capriciously rejected or ignored by both Dr. Moon and the Trust Fund's vocational expert. On the other hand, [the worker's] vocational expert correctly relied on Dr. Pinchback's findings in assessing [the worker's] vocational impairment at total and permanent.
 "This court specifically finds that the decision of the Review Board is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record, and that the Review Board abused its discretion in not so finding.
 "WHEREFORE, it is hereby ORDERED, DECREED and ADJUDGED that the decision of the Review Board is hereby set aside, reversed and/or modified, and that the Review Board shall modify its decision to the effect that [the worker] is totally and permanently disabled from working under the guidelines of the . . . Employees Injury Compensation Trust Fund.
 "Dr. Moon also testified that he had not spoken to Dr. Downs concerning his conclusion that [the worker] could not do the work of a laboratory technician, with or without accommodations."
(Emphasis original.)
On February 15, 2002, the Trust Fund filed a motion to alter, amend, or vacate the trial court's judgment. On April 2, 2002, the worker filed a response to the Trust Fund's postjudgment motion. On April 12, 2002, the trial court denied the Trust Fund's postjudgment motion. On May 24, 2002, the Trust Fund filed a notice of appeal to this court.
On appeal, the Trust Fund argues that the trial court erred by substituting its judgment for that of the Review Board and by ordering the Review Board to modify its decision to state that the worker was totally and permanently disabled. This court has stated:
 "This court reviews a trial court's judgment regarding the decision of an administrative agency `without any presumption of its correctness, since [the trial] court was in no better position to review the [agency's decision] than' this court. State Health Planning Res. Dev. Admin. v. Rivendell of Alabama, Inc., 469 So.2d 613, 614 (Ala.Civ.App. 1985). Under the Alabama Administrative Procedure Act (`AAPA'), § 41-22-1 et seq., Ala. Code 1975, which governs judicial review of agency decisions,
 "`[e]xcept where judicial review is by trial de novo, the agency order shall be taken as prima facie just and reasonable and the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact, except where otherwise authorized by statute. The court may affirm the agency action or remand the case to the agency for taking additional testimony and evidence or for further proceedings. The court may reverse or modify the decision or grant other appropriate relief from the agency action, equitable or legal, including declaratory relief, if the court finds that the agency action is due to be set aside or modified under standards set forth in appeal or review statutes applicable to that agency or if substantial rights of the petitioner have been prejudiced because the *Page 1145 
agency action is any one or more of the following:
 "`(1) In violation of constitutional or statutory provisions;
 "`(2) In excess of the statutory authority of the agency;
"`(3) In violation of any pertinent agency rule;
"`(4) Made upon unlawful procedure;
"`(5) Affected by other error of law;
 "`(6) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 "`(7) Unreasonable, arbitrary, or capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.'
 "§ 41-22-20(k), Ala. Code 1975 . . . . In reviewing the decision of a state administrative agency, '[t]he special competence of the agency lends great weight to its decision, and that decision must be affirmed, unless it is arbitrary and capricious or not made in compliance with applicable law.' Alabama Renal Stone Inst., Inc. v. Alabama Statewide Health Coordinating Council, 628 So.2d 821, 823 (Ala.Civ.App. 1993). . . . Neither this court nor the trial court may substitute its judgment for that of the administrative agency. Alabama Renal Stone Inst., Inc. v. Alabama Statewide Health Coordinating Council, 628 So.2d 821, 823 (Ala.Civ.App. 1993). `This holds true even in cases where the testimony is generalized, the evidence is meager, and reasonable minds might differ as to the correct result.' Health Care Auth. of Huntsville v. State Health Planning Agency, 549 So.2d 973, 975
(Ala.Civ.App. 1989). Further, `an agency's interpretation of its own rule or regulation must stand if it is reasonable, even though it may not appear as reasonable as some other interpretation.' Sylacauga Health Care Ctr., Inc. v. Alabama State Health Planning Agency, 662 So.2d 265, 268
(Ala.Civ.App. 1994)."
Colonial Mgmt. Group, L.P. v. State Health Planning Dev. Agency,853 So.2d 972, 974-75 (Ala.Civ.App. 2002) (emphasis omitted).
The trial court found that the Review Board's determination was due to be modified pursuant to § 41-22-20(k)(6) (7), Ala. Code 1975, because, it determined, the Review Board's action was "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record" and was "[u]nreasonable, arbitrary, or capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion." We disagree. Our review of the record confirms the Trust Fund's assertion on appeal that it and the Review Board were presented with conflicting evidence concerning the extent of the worker's physical impairment (the differing opinions of Dr. Pinchback, Dr. Rivard and Dr. Moon); the extent of her vocational disability (the different ratings provided by Smith, Logan, and Crumpton); the possibility that the worker magnified her symptoms (Dr. Kirkland's psychological evaluation, Dr. Rivard's IME findings, and Dr. Kemp's progress note); and her submaximal effort in testing (Rehab Associates' FCE results).
Substantial evidence has been defined as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." Westv. Founders Life Assurance Co., 547 So.2d 870, 871 (Ala. 1989). There was substantial evidence supporting the Trust Fund's 63% vocational-disability rating. That rating was determined by Smith before she considered the opinion of Dr. Moon; she considered only the opinion of Dr. Pinchback in her first vocational evaluation, *Page 1146 
contrary to the trial court's finding that "she accepted Dr. Moon's findings, rather than Dr. Pinchback's findings." Dr. Moon's opinion was considered, in addition to Dr. Pinchback's opinion, only in Smith's second vocational evaluation in which she assigned the worker a 52% vocational-disability rating.
Additionally, we do not find the Review Board's determination to be arbitrary or capricious, and, based upon the deference we are to apply in reviewing its determination, Colonial Management Group, supra, we conclude that the trial court erred in ordering the Review Board to modify its determination. Neither this court nor the trial court can substitute its judgment for that of the Review Board. Id. Accordingly, the trial court's judgment is due to be reversed and the cause remanded for the trial court to enter an order affirming the Review Board's determination of the worker's vocational-disability rating.
REVERSED AND REMANDED.
YATES, P.J., and THOMPSON, PITTMAN, and MURDOCK, JJ., concur.
[1] The worker had been referred to Dr. Kemp by Dr. Pinchback for pain-management assistance. Dr. Kemp was considering surgery to place a pain-relieving pump device in the worker.
[2] However, during his deposition testimony on October 26, 2000, Dr. Moon stated that he did not have most of Dr. Pinchback's records when he performed the IME.
[3] In his deposition, Dr. Moon stated that "overestimating and misrepresenting" may not have been the right terms but that "[t]he impairment rating is certainly high, and it's too high for what [the worker] has."
[4] The quoted portion reflects what the worker's counsel represented the letter to state during Dr. Moon's deposition. The letter does not appear in the record before this court, although it was mentioned during the testimony of more than one witness. During Dr. Moon's deposition, the Trust Fund did initially object to questioning regarding the letter on the basis that a proper foundation had not been laid; however, it failed to object to further, more specific questioning by the worker's counsel regarding the letter. Dr. Moon stated that his and Dr. Downs's opinion regarding the worker's ability to return to work differed.
[5] The May 19 letter refers to the May 12 letter, stating that the worker was being terminated because she had failed to contact Dr. Downs or to attend a meeting specified in the May 12 letter.
[6] The worker's letter requesting a hearing before the Review Board does not appear in the record.